**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

TOWN OF EAST HAMPTON,

                Plaintiff,

    -against-

INCORPORATED VILLAGE OF EAST HAMPTON d/b/a
EAST HAMPTON FIRE DEPARTMENT,

                Defendant,

AMERICAN ALTERNATIVE INSURANCE
CORPORATION,

                As Interested Party.

Case No. 20-1787

**COMPLAINT**

Plaintiff Town of East Hampton ("Plaintiff" or "Town") by and through its attorneys, Rigano LLC, as and for its complaint against Defendant Incorporated Village of East Hampton d/b/a East Hampton Fire Department ("Defendant") and naming American Alternative Insurance Corporation ("AAIC") as Interested Party in its capacity as insurer to Defendant, respectively, alleges as follows:

**Nature of the Action**

1.    Plaintiff brings this action pursuant to 42 U.S.C. §§ 6972(a)(1)(B) (RCRA), 9607(a), and 9613(g)(2) (CERCLA) against Defendant, which is insured by AAIC ("AAIC"),[1]

---

[1]    The liability policies issued by AAIC grant coverage to Defendant and the East Hampton Fire Department as insureds.  The coverage limits for the period of 1998 to 2018, inclusive of the excess policy limits range from $13 million to $23 million per year.  The policies contain an applicable exception to the pollution exclusion whereby the policies cover all losses related to pollution caused by "Emergency operations", "Training operations", "Water runoff from the cleaning of equipment used in 'emergency operations'", and "property damage" caused by a "hostile fire". The marketing materials for the policies provide examples of coverage that are substantially similar to the losses set forth in this complaint.  More information regarding the policies and marketing materials are discussed *infra*.

for, among other things: (I) injunctive relief requiring Defendant to: (i) properly dispose of all aqueous film-forming foam ("AFFF") in its possession, custody or control that contains latent toxic chemicals called perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonate ("PFOS") and/or PFOA/PFOS precursors, (ii) immediately disclose by fact discovery document production and testimony all locations where East Hampton Fire Department ("EHFD") used AFFF, stored AFFF and washed AFFF equipment at the Airport (defined below) and/or within the boundaries of the Superfund Site (defined below), and (iii) investigate and remediate (at AAIC's cost) all PFOA/PFOS contamination at and emanating from the Airport and/or Superfund Site caused, in whole or in part, by EHFD's storage of AFFF, use of AFFF and/or washing of AFFF equipment; (II) recovery of Town's past and future costs and damages associated with remediating the human health and environmental issues caused by the PFOA/PFOS contamination at and emanating from the Superfund Site, including, but not limited to, Plaintiff's costs in connection with: (i) supplying bottled water to the Town's residents who have detected perfluorinated compounds in their drinking water wells, (ii) extending the public drinking water supply line and connecting the homes of Wainscott residents thereto to enable the supply of clean and safe drinking water, (iii) investigating, treating, and remediating contamination at and emanating from the Superfund Site (defined below) located in Wainscott (defined below) to eliminate PFOA/PFOS contamination caused, in whole or in part, by EHFD, (iv) protecting the public health, safety, welfare, and the environment; and (III) declaratory judgment against Defendant for allocation of future related costs to investigate and remediate contamination EHFD caused at and emanating from the Superfund Site.

## Jurisdiction and Venue

2.      Plaintiff brings this civil suit pursuant to: (i) the citizen suit enforcement provisions

of Section 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §
6972(a)(1)(B), and (ii) sections 42 U.S.C. 9607(a) and 9613(g) of the Comprehensive
Environmental Response, Compensation and Liability Act ("CERCLA").

3.      This Court has subject matter jurisdiction over the parties and this action pursuant
to 42 U.S.C. §§ 6972(a), 9613(b) and 28 U.S.C. §§ 1331, 1367.

4.      Venue properly lies in the Eastern District of New York pursuant to 42 U.S.C. §§
6972(a) and 9613(b) as well as 28 U.S.C. § 1391(b) because the endangerment may occur, the
release(s) of PFOA/PFOS did occur and damages did occur in this district, among other reasons.

5.      On November 12, 2019, Plaintiff notified Defendant and third parties as required
of Plaintiff's intention to file suit against Defendant to remedy the imminent and substantial
endangerment referenced herein in compliance with the statutory notice requirements set forth in
42 U.S.C. § 6972(b)(2)(A), and the corresponding regulations set forth in 40 C.F.R. Part 254.

6.      More than ninety (90) days have elapsed since Plaintiff served the November 12,
2019 notice letter on Defendant, during which time Village has failed to commence any action to
redress the endangerment referenced in the letter.

7.      At the time of the filing this litigation, Plaintiff will provide copies of this
Complaint to the Attorney General of the United States and the Administrator of the United States
Environmental Protection Agency pursuant to 42 U.S.C. §§ 6972(b)(2)(F), 9613(l).

8.      The Court has authority to issue a declaratory judgment concerning the rights and
liabilities of the parties pursuant to 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. §§ 6972(a),
9613(g)(2).

## Parties

9.      Plaintiff Town of East Hampton is a municipality located in southeastern Suffolk

County, New York.

10.     The Town's population consists of approximately 21,000 people.

11.     The Hamlet of Wainscott ("Wainscott") is a neighborhood within the Town and subject to the Town's jurisdiction.

12.     Plaintiff owns the land located at the East Hampton Airport (the "Airport") located at 200 Daniels Hole Road Wainscott, NY and East Hampton Fire Districts Training Facility k/n/a Lawrence Franzone Fire Training Facility located at 65 Industrial Road, East Hampton, New York (the "Fire Training Facility") located in Wainscott.

13.     Defendant Incorporated Village of East Hampton is a municipality in Suffolk County, New York located in the Town of East Hampton and is a separate, smaller jurisdiction than the Town.

14.     Defendant (and not the Town) owns, operates and directs EHFD which stored and used AFFF in Wainscott and caused the contamination at issue.

15.     EHFD maintains a substation at 72 Industrial Road Wainscott, NY, near the Airport, but off of the Airport property (the "EHFD Substation").

16.     The Town owns the land where the EHFD Substation is located.

17.     EHFD has stored AFFF and parked AFFF trucks at the EHFD Substation during all relevant times.

18.     EHFD stored AFFF at the EHFD Substation located at the Airport in fifty-five (55) gallon drums without a secondary containment system meaning if AFFF from the drums leaked or a drum cracks, AFFF would impact the immediately neighboring soil.

19.     EHFD has extinguished actual fire in Wainscott by use of AFFF, including at the Airport.

20.     EHFD has used AFFF during training exercises at the Airport and the Fire Training

4

Facility.

21.    After use of AFFF, EHFD would wash its trucks and equipment in a separate and distinct location from where it used AFFF.

22.    By such washing, the AFFF residue was released to the ground causing PFOS and/or PFOA contamination.

23.    Despite demand made by the Town in writing, Village has not disclosed all locations where EHFD used AFFF, stored AFFF, and/or washed AFFF equipment within the boundary of the Airport and/or Superfund Site.

24.    AAIC is a Delaware Corporation with a headquarters at 555 College Road East, Princeton, NJ 08540 and is as interested party to this litigation as insurer to Defendant Village.

## Factual Background

### I.    PFAS Substances

25.    Per- and polyfluoroalkyl substances ("PFAS") are a family of hundreds of man-made chemicals comprised of primarily carbon and fluorine.

26.    PFAS chemicals were invented in the 1930's.

27.    PFAS chemicals are effective in products requiring fire extinguishment and repellency of water, oil, and stains.

28.    PFOA and PFOS are the two most widely studied PFAS chemicals.

### II.    Biopersistent, Bioaccumulative and Toxic Effects of PFOA and PFOS

29.    PFOA and PFOS are man-made chemicals that do not exist naturally.

30.    PFOA and PFOS are biopersistent.

31.    PFOA and PFOS can persist in the environment for decades.

32.    PFOA and PFOS do not easily degrade.

33.     PFOA and PFOS readily move through soil, sand and water.

34.     PFOA and PFOS are highly soluble in water.

35.     PFOA and PFOS bioaccumulate in humans, animals, and fish.

36.     PFOA and PFOS biomagnify in humans, animals, and fish.

37.     PFOA and PFOS can accumulate through the food chain.

38.     PFOA and PFOS may accumulate in humans in the serum, kidney and liver.

39.     PFOA and PFOS have a lengthy half-life within the human body.

40.     PFOA and PFOS have been found to cross the placenta wall from pregnant mother to fetus.

41.     PFOA and PFOS can be transferred from mother to infant via breastmilk.

42.     The United States Environmental Protection Agency ("EPA") has found that PFOA and PFOS may cause harm to developing fetuses and breastfed infants via transmission from the mother.

43.     PFOA and PFOS are toxic at very low levels.

44.     Human exposure to PFOA and PFOS has been linked to several diseases including testicular cancer, kidney cancer, thyroid disease, ulcerative colitis, hypertension and other conditions.

45.     The full health risk and impacts of exposure to PFOA and PFOS are still being studied.

46.     Injuries associated with PFOA and PFOS are typically latent and may manifest years or decades after exposure.

47.     Studies have shown that approximately 99% of Americans have detectable levels of PFOA and/or PFOS in their blood.

48.     Studies have shown that virtually every baby born in America is born with a

6

detectible level of PFOA and/or PFOS in his/her blood.

49.     There is no background or naturally occurring level of PFOA and/or PFOS as the chemicals are not natural and are man-made.

50.     No human had PFAS in their blood prior to the chemicals being invented.

51.     PFAS substances, and particularly PFOA and PFOS, have been detected ubiquitously throughout the world including as far as the Arctic.

52.     Due to the foregoing, the manufacture, import and use of PFOA and PFOS is restricted in the United States.

53.     On May 16, 2000, the EPA publicly announced the phaseout of PFOS from production because "these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."  The press release went on to state "PFOS chemicals are used to produce a range of products from fire-fighting foams coatings for fabrics, leather, and some paper products, to industrial uses such as mist suppressants in acid baths."

54.     The press release received national news attention in the New York Times, among other media outlets.

55.     In 2009, the Stockholm Convention on Persistent Organic Pollutants restricted production and use of PFOS.  In 2019, the Stockholm Convention on Persistent Organic Pollutants added PFOA to the list of substances to be eliminated from production and use.

56.     EPA authorized New York State to implement its own hazardous waste program pursuant to 42 U.S.C. 6926(b).

57.     New York accepted that authority pursuant to New York Environmental Conservation Law sections 27-0900, *et seq.*

58.     Thus, pursuant to 51 Fed. Reg. 1779 [1986], New York State is authorized to

"operate in lieu of the Federal [hazardous waste] program."

59.     In 2016, PFOA and PFOS were added to New York State's list of hazardous substances.

60.     In 2016, EPA established a drinking water health advisory of seventy (70) parts per trillion of combined PFOA/PFOS.

61.     Certain states have promulgated advisory exposure levels lower than seventy (70) parts per trillion.

62.     In September 2017, Governor Cuomo established a Drinking Water Quality Council tasked with, among other things, making recommendations to establish Maximum Contaminant Levels ("MCLs") in drinking water for PFOA and PFOS and other emerging contaminants.

63.     A MCL is the maximum level of a contaminant allowed in public drinking water, which, once established, creates a legally enforceable standard that requires applicable water systems to monitor, report findings and keep the contaminant below the level set.

64.     Exceedances of MCLs must be reported to the public and require mitigation once promulgated and effective.

65.     MCLs serve as a safety guideline for private drinking water wells.

66.     In New York State, groundwater cleanup standards for a particular contaminant are set at the same level as an applicable MCL.

67.     On December 18, 2018, the Drinking Water Quality Council made MCL recommendations of ten (10) parts per trillion for PFOA and ten (10) parts per trillion for PFOS (together, the "Recommended MCLs").

68.     In 2019, the New York State Department of Health adopted the Recommended MCLs as regulation subject to public comment.

8

69.     It is expected that New York State will adopt the Recommended MCLs as enforceable standards in 2020.

70.     If the Recommended MCLs are adopted as expected, they will be two of the lowest MCLs adopted in New York for any contaminant, evidencing the extraordinary toxicity of these compounds.

### III.     Environmental Impacts of PFOA/PFOS

71.     PFOA and PFOS contamination of environmental media (i.e. soil and groundwater) is prevalent throughout the country.

72.     Airports, fire stations, and firefighting training facilities are of particular concern for PFOA/PFOS contamination due to use of AFFF at those facilities.

73.     Upon PFOA or PFOS coming into contact with soil, PFOA and PFOS migrate downward through the soil until they reach the groundwater.

74.     PFOA and PFOS readily dissolve into groundwater.

75.     With its natural movement, the groundwater flows and, if contaminated with PFOA and PFOS, the groundwater carries PFOA and PFOS spreading the contamination over a wide area.

76.     Groundwater contaminated with PFOA and PFOS is of particular concern where groundwater is used as drinking water.

77.     In 1978, EPA declared Suffolk County as a sole source aquifer meaning: (i) "[t]here are no reasonably available alternative drinking water sources should the aquifer become contaminated", and (ii) "if contaminated, [the aquifer] would create a significant hazard to public health."

78.     The residents of the Town, including residents of Wainscott, rely on the sole source aquifer for their drinking water.

79.     The sole source of drinking water for the residents of Suffolk County, including residents of the Town of East Hampton, is the groundwater.

80.     On Long Island, drinking water supply wells supply drinking water by pumping groundwater from the aquifer.

81.     Where groundwater is contaminated, drinking water supply wells pump and supply the contaminated groundwater as drinking water if such water is not treated.

82.     A majority of residents in the Town obtain water from private drinking water wells.

83.     These wells pump groundwater from beneath residents' individual properties.

84.     Private wells are generally shallow wells and are more susceptible to contamination than public drinking water supply wells, which generally pump deeper groundwater that is less susceptible to contamination.

**IV.    PFOA/PFOS Contamination Discovered in the Hamlet of Wainscott**

85.     In Wainscott, groundwater flows in a south/southeasterly direction from the Airport, EHFD Substation, and Fire Training Facility and towards approximately 520 residences and businesses.

86.     Residents in Wainscott obtain their drinking water from the groundwater.

87.     Prior to Town's actions discussed herein, residents in Wainscott obtained their drinking water from groundwater supplied by private wells on each separate property.

88.     Because residents of Wainscott live downgradient from the Airport, EHFD Substation and Fire Training Facility where AFFF was used and stored and those residents rely on private drinking water wells, Suffolk County Department of Health Services sampled Wainscott residents' private wells in 2017.

89.     As a result of that sampling, it was first discovered in October 2017 that the private wells of several Wainscott residents were contaminated with PFOA and PFOS in excess of the

EPA health advisory level of seventy (70) ppt and many more above the Recommended MCLs of ten (10) ppt.

90.     For a period after October 2017, Suffolk County Department of Health Services has offered free testing of private wells to residents and property owners within Wainscott.

91.     The geographic bounds of the area of concern was defined by Suffolk County Department of Health Services as follows: a northern boundary of the Airport, an eastern boundary of Daniels Hole Road and Georgica Pond, a southern boundary of the Atlantic Ocean and the western boundary by the area immediately west of Wainscott Harbor Road, Town Line Road and Wainscott Hollow Road.

92.     Over 230 private wells within the area of concern were found to contain PFOA and/or PFOS.

93.     Over seventy-five (75) private wells within the area of concern were found to contain PFOA and/or PFOS at levels in excess of the Recommended MCLs.

94.     Over ten (10) wells within the area of concern were found to contain PFOA and/or PFOS at levels in excess of the EPA's seventy (70) parts per trillion health advisory level.

95.     As the impacted private wells do not have treatment for PFOA or PFOS, Wainscott residents were drinking contaminated water potentially for decades.

96.     All private wells within the area of concern required remediation because PFOA or PFOS may latently enter private wells at unacceptable levels at any time as other contaminated wells in the area reveal that the groundwater contamination is area-wide and flowing.

97.     It is not feasible for homeowners to consistently and reliably test their private wells for PFOA and PFOS due to the exorbitant sampling cost, among other reasons.

**V.     Actions of Plaintiff to Mitigate the Harm to Human Health and the Environment**

98.     Immediately upon learning of the contamination in Wainscott residents' private

11

drinking water wells in October 2017, Plaintiff engaged in numerous efforts to protect the health, safety and welfare of its residents as well as the environment.

99.     In October 2017, Plaintiff advised residents located within the area of concern not to drink, cook or shower with their private well water.

100.     Beginning in October 2017, Plaintiff supplied bottled water for drinking, cooking and bathing to certain Wainscott residents as a result of PFOA/PFOS detection in residents' private wells.

101.     Plaintiff has incurred significant costs associated with providing bottled water to impacted residents.

102.     On November 10, 2017, NYSDEC, through its Division of Environmental Remediation, sent a letter to the Town stating, in pertinent part as follows:

> We have received information that certain perfluorinated compounds (PFCs) have been detected in nearby water supply wells, which may be attributable to current or past operations on your property. These compounds are known components of firefighting foams, and are listed as hazardous substances in New York State (6 NYCRR Part 597). This information leads us to suspect that hazardous waste may have been disposed of at [the Airport].
>
> Therefore, this letter constitutes DEC's notification to you as the identified property owner that this property is considered a potential inactive hazardous waste disposal site. If DEC determines that hazardous waste has been disposed of on the property and that the hazardous waste poses a significant threat to public health or the environment, the property will be listed on the Registry of Inactive Hazardous Waste Disposal Sites (Registry). . .
>
> This letter also serves as DEC's notification to you of the need to carry out an investigation in accordance with DEC's technical requirements for a site characterization. In addition to carrying out the investigation (which will include installing and sampling on-site wells), there is a need to install point of entry treatment systems (POETS) or other alternate water supply (i.e., waterline extension) to address the contaminated water supply wells mentioned above. Also bottled water must be provided until such time as that system or alternate supply is in place. We understand that, presently, the

Town of East Hampton is providing bottled water to the affected residences.

Please contact me within 10 business days to discuss the necessary scope of the investigation and the installation of the POET systems or alternate water supply. . . if the site is determined to be an inactive hazardous waste disposal site and DEC incurs costs to investigate or remediate the site, DEC will seek to recover all such costs from any responsible person.

103.    The Suffolk County Water Authority's local public drinking water distribution system is not contaminated with PFOA, PFOS or any other contaminants in excess of binding standards, health advisories or the Recommended MCLs.

104.    In accordance with NYSDEC direction, Plaintiff extended the public drinking waterline operated by the Suffolk County Water Authority to Wainscott, and is in the process of, connecting all Wainscott residences to the extended water line.

105.    The connection of Wainscott residences to Suffolk County Water Authority's public water supply has enabled private residents to no longer rely on their private wells for drinking water.

106.    Hundreds of residences have already connected to the public drinking water supply.

107.    The cost to Plaintiff of the water main extension is no less than $7,705,163.43, net of grants.

108.    Plaintiff has hired numerous environmental professionals to investigate and monitor the PFOA/PFOS in environmental media.  Those costs are ongoing and continue to mount.

**VI.    EHFD's Use and Storage of AFFF Caused PFOA and PFOS Contamination**

109.    PFOA/PFOS or their precursors are, or have been, contained in AFFF.

13

110.    AFFF has been used for decades to extinguish flammable liquid fires.

111.    AFFF concentrate is mixed with water to make a liquid foam which is aerated and applied to fire suffocating the fire of oxygen and thereby extinguishing it.

112.    Upon AFFF being sprayed, the AFFF material contacts the ground and PFOA and PFOS or their precursors enter the soil.

113.    The PFOA/PFOS or their precursors then migrate through the soil to the groundwater below causing PFOA/PFOS contamination.

114.    AFFF has been stored and used throughout the country at, among other places, airports, fire stations, and firefighting training facilities.

115.    As a result, PFOA/PFOS contamination is prevalent at and emanating from airports and firefighting training facilities throughout the country.

116.    On January 24, 2017, Chief Gerard Turza, the Chief of the East Hampton Fire Department completed the Class B Fire Suppression Foam Usage Survey and submitted the same to NYSDEC.  By the Survey, Mr. Turza represented, *inter alia*, as follows: (i) approximately 200 gallons of AFFF was and, at the time, continued to be stored at the EHFD Substation, (ii) training with AFFF occurred between 1 and 10 times between 2007 and 2017 for "various training evolutions", (iii) AFFF was used for emergency response "several times unknown exact dates" between 2007 and 2017.

117.    Mr. Turza's statements set forth in this survey are corroborated by pictures in the Town's possession, information in the Town's possession, as well as locations of soil and groundwater contamination found in areas where EHFD used and stored AFFF.

118.    Some of the instances in which the Village, through EHFD used AFFF at and around the Airport include:  (i) on or around August 28, 2012, use of AFFF to extinguish fire caused by a plane crash at the eastern part of the Airport, (ii) on or around June 6, 2008 training

14

exercise where AFFF was used by the fire departments at the northern part of the Airport, (iii) in 1997, a training exercise where AFFF was used by the fire departments at the eastern part of the Airport, (iv) in 1995, use of AFFF to extinguish fire caused by a plane crash at the northern part of the Airport, and (v) continuous AFFF use by the fire departments at the Fire Training Facility.

119.    EHFD's use of AFFF, storage of AFFF and washing of AFFF equipment has caused contamination at and emanating from the Airport, Fire Training Facility, EHFD Substation and Wainscott residents' drinking water wells.

120.    After each AFFF use, AFFF leak or AFFF equipment washing event, EHFD did not to contain the release or otherwise mitigate environmental harm by failing to, among other things: (i) excavate impacted soil, or (ii) place a liner on the ground to prevent migration of PFOA/PFOS before AFFF training use or to contain leakage from negligent storage/washing.

**VII.    NYSDEC Designates Town's Property as a Superfund Site**

121.    In 2018, NYSDEC conducted a site characterization of the Airport, EHFD Substation, and Fire Training Facility to determine if the PFOA/PFOS contamination is present at those properties.

122.    Before conducting the site characterization, NYSDEC, through its contractor conducted a robust site review.  In fact, NYSDEC's site characterization report states the site review involved:

> Site Review: Identify potential historical events with AFFF use, such as training events, plane/car crashes on airport property where AFFF was applied, as well as current/former AFFF storage areas. Select proposed sample locations with final placement to be established during site visits.

> Preliminary Activities: Attend on-site meeting with NYSDEC personnel to discuss proposed sampling locations based on research findings. Solicit subcontractor bids, formalize budget, and prepare health and safety plan.

123.   NYSDEC's report goes on to state:

Using information provided by local, county, and state contacts along with available topographic and geologic mapping, AECOM staff identified several target areas that warranted subsurface investigation, including known areas of AFFF discharge. Additional locations were selected for a second phase of investigation after initial results were reviewed.

124.   The site review resulted in fourteen (14) target sampling areas after NYSDEC and its contractor conducted their robust independent research to determine the target areas of concern.

125.   This site characterization resulted in NYSDEC detecting significant PFOA/PFOS contamination in groundwater at the Airport, EHFD Substation and Fire Training Facility at levels approximately thirty (30) times the Recommended MCLs, and 15.8 ppb in soil.

126.   NYSDEC has concluded that there are distinct "areas of concern" at the Airport, EHFD Substation and Fire Training Facility comprising approximately forty-seven (47) acres.

127.   NYSDEC has concluded that all detected PFOA/PFOS contamination at the Airport, EHFD Substation and Fire Training Facility is located in areas where EHFD used AFFF and where EHFD stored AFFF and AFFF equipment.

128.   Specifically, contamination was detected as follows:[2]

   a.   At the location of a 1995 plane crash at the northern part of the Airport, NYSDEC detected PFOA/PFOS contamination at 3600 ppt in soil and 17.7 ppt in groundwater (more than the Recommended MCL).  The following are pictures of this event:

---

[2]     The AFFF events listed in this section are examples of EHFD AFFF use/storage which have caused contamination and should not be deemed an exhaustive list.  Town expects discovery to reveal additional uses/locations of EHFD AFFF use, storage and washing of equipment as well as PFOA/PFOS contamination in those areas.

16





b.  The location of a 1997 EHFD training exercise at the eastern part of the Airport, NYSDEC detected PFOA/PFOS contamination at 720 ppt in soil and 299.3 ppt in groundwater (approximately thirty (30) times the Recommended MCL). The following is a picture of this event:



c. The location of the 2008 EHFD training exercise at the northern part of the Airport, NYSDEC detected PFOA/PFOS contamination at 4000 ppt in soil and 287 ppt in groundwater (approximately thirty (30) times the Recommended MCL).  The following is a picture of this event:



d. The location of the EHFD Substation which is south of the Airport.  This location is where EHFD stored AFFF and AFFF equipment and presumably washed such

18

equipment.  NYSDEC detected PFOA/PFOS contamination at 3900 ppt in soil and 174 ppt in groundwater in this location (approximately seventeen (17) times the Recommended MCL).

e.  At the Fire Training Facility on Industrial Road which is just south of the Airport where EHFD continuously trained, NYSDEC detected PFOA/PFOS contamination at 15.8 ppb in soil and 160 ppt in groundwater (approximately sixteen (16) times the Recommended MCL).

129.    NYSDEC's report concludes "The presence of PFAS compounds in soil above laboratory reporting limits indicate that release(s) have occurred on-site . . . Investigation findings show that the historic use and/or storage of AFFF have impacted Site groundwater quality."

130.    On May 24, 2019, NYSDEC designated the areas of concern comprising forty-seven (47) acres of the Airport, EHFD Substation and Fire Training Facility as a Class 2 Inactive Hazardous Waste Disposal Site (the "Superfund Site") as a result of the detected PFOA/PFOS contamination and AFFF use, AFFF storage and washing of AFFF equipment by EHFD.

131.    The Class 2 designation means that "the disposal of hazardous waste has been confirmed and the presence of such hazardous waste or its components or breakdown products represents a significant threat to public health or the environment."

132.    On April 9, 2019, after reviewing NYSDEC's site characterization report, the New York State Department of Health sent a letter to NYSDEC stating, in pertinent part, that the Superfund Site "represents a significant threat to human health."

133.    The areas of concern "consist of the area in and around the terminal, the fuel depot, the north end of the runway 34 and west of Daniels Hole Road as one area, the area around the fire training facility and along Industrial Road as the second area, and the area around the separate

structure housing the fire-fighting equipment off Industrial Road on the southeast portion of the airport as the third area."

134.    NYSDEC issued the following picture outlining in red the areas that comprise the Superfund Site:



135.    Each of these areas are areas where the Village, through EHFD used or stored AFFF.

136.    The superfund site designation requires the Town as property owner of the Airport, EHFD Substation, and Fire Training Facility to investigate and remediate all contamination at and emanating from the Superfund Site at a significant cost.

20

137.    As a result of the superfund site designation, NYSDEC is demanding, and is requiring pursuant to the New York Environmental Conservation Law ("ECL") and applicable NYSDEC regulations, that the Town, *inter alia*: (i) pay New York State's past and future costs associated with NYSDEC's site characterization (SC) and otherwise, (ii) conduct an investigation (Remedial Investigation (RI) and Feasibility Study (FS)) of the contamination at and emanating from the Superfund Site under NYSDEC oversight, and (iii) remediate the contamination at and emanating from the Superfund Site under NYSDEC oversight.

138.    NYSDEC requires, pursuant to the ECL and applicable NYSDEC regulations, that the Town conducts and pays for the foregoing under the terms of a binding consent order executed by the Town and DEC.

139.    The Consent Order requires the Town to submit "an approvable Remedial Investigation/Feasibility Study Work Plan to the Department within sixty (60) days after the effective date of this Order."

140.    The purpose of a Remedial Investigation is to determine the nature and extent of contamination.

141.    According to the Consent Order a Remedial Investigation/Feasibility Study Work Plan is defined as: "Work Plan which provides for the investigation of the nature and extent of contamination within the boundaries of the Site and emanating from such Site and a study of remedial alternatives to address such on-site and off-site contamination".

142.    As EHFD stored and used AFFF within the boundaries and outside of the Superfund Site without Town direction or supervision, only EHFD has the information and documentation necessary to specify all appropriate sampling locations in the Remedial Investigation/Feasibility Study Work Plan.

21

143.    In order to adequately investigate the nature and extent of PFOA/PFOS contamination within the boundaries of the Superfund Site and emanating from the Superfund Site, Defendant must be required to immediately disclose all locations where EHFD used AFFF, stored AFFF and washed AFFF equipment.

144.    Prior to the commencement of this litigation, Town requested Defendant disclose all material information to allow for the NYSDEC-required investigation to proceed.  Defendant denied Town's request.

145.    PFOA and PFOS do not degrade in the environment meaning contamination will persist without active remediation.

146.    It is expected that NYSDEC will require significant and active remediation at the Superfund Site and contamination emanating therefrom throughout Wainscott (over 1,000 acres) to remedy the contamination that persists in the sole source aquifer.

147.    The primary way to abate PFOA/PFOS contamination in soil is by excavation and disposal.

148.    The primary way to abate PFOA/PFOS contamination in groundwater is by pumping the groundwater through granular activated carbon and discharging the cleansed groundwater back into the aquifer.

149.    The Town's cost to investigate and remediate the contamination at and emanating from the Superfund Site will cost tens of millions of dollars.

**VIII.    The Village's Insurance Policy**

150.    According to a letter dated September 24, 2019 from Rubin, Fiorella & Friedman LLP as coverage counsel to AAIC, the Village's insurer, sent in connection with a previously commenced litigation by the Town relating to the Village's use of AFFF–

22

AAIC issued a series of general liability policies to Inc. Village of East Hampton, which have renewed on August 1 of each year dating from August 1, 1998 to August 1, 2018 (the "AAIC Policies"). The AAIC Policies also provide commercial umbrella coverage. The policy limits for each policy period are set forth in Exhibit A, which is enclosed.

The AAIC Policies' Emergency Service Organization General Liability Coverage Form, which dates back to the policy beginning August 1, 2006[], provides relevant to our analysis as follows:

. . .

This insurance does not apply to:

. . .

(c) Pollution

Any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to pollution, however caused . . . This exclusion does not apply to:

(1) "Emergency Operation" conducted away from premises owned by or rented to you or any fire department, hazardous materials unit, first aid squad" ambulance squad or rescue squad qualifying as an insured under this part; or
(2) "Training operations"; or
(3) Water runoff from the cleaning of equipment used in 'emergency operations'' or
(4) . . .
(5) "Bodily injury" or "property damage" caused by heat, smoke or fumes from a "hostile fire":
      (a) At or from premises you own, rent or occupy; or
      (b) At or from any site or "location" in connection with operations described in (1), (2), or (3) above.

151.      The letter goes on to state that EHFD is a "covered emergency service organization" and is a named insured.

152.      The letter goes on to state that the Policy limits for the AAIC policies for the period of 1998 to 2018, inclusive of the excess policy limits range from $6 million per occurrence and $13 million aggregate per year to $11 million per occurrence and $23 million in the aggregate.

23

153.     According to Second Circuit case law, the migration of contaminants in groundwater constitutes new property damage triggering policies for all years in which contaminants migrate.

154.     As PFOA/PFOS have migrated and continue to migrate in groundwater as a result of EHFD's use of AFFF, storage of AFFF and washing of AFFF equipment, Defendant has tens of millions, if not over one hundred million dollars of applicable coverage.

155.     Due to the foregoing, the letter does not deny AAIC's obligation to indemnify the Village and merely serves as a reservation of AAIC's rights on very limited grounds. The letter likewise states that AAIC has a duty to defend Defendant.

156.     VFIS a division of Glatfelter Insurance Group ("VFIS"), the underwriter for AAIC, touts itself as "America's Leading Insurance Provider for Emergency Organizations" markets the Emergency Service Organization General Liability Coverage Form to provide coverage for "[o]perational pollution liability for incidents arising from training activities, equipment washdowns or off-premises emergency calls."

157.     Both AAIC's and VFIS's names are prominently displayed in large bold letters on the cover pages of the Village's insurance policies.

158.     The VFIS marketing materials provided for these policies provide scenarios for which coverage applies including the following examples:

   a.   "A fire department is called to the scene of an overturned tank truck transporting chlorine gas. While extricating the driver with a jaws of life tool, the fire department punctures the tank holding the chlorine gas. The people in the area are overcome by the gas fumes and require medical treatment. The Operational Pollution Liability coverage would provide the department with a defense and pay any judgment up to the limit of the policy."

   b.   "A fire department used several types of accelerants to burn down some old sheds on their property. Newer members were trained on how to extinguish each blaze. Traces of these accelerants were found on a neighbor's land and in another

24

neighbor's drinking water. Claims were filed against the fire department for the costs of drilling a new well and removing the contaminated earth. The Operational Pollution Liability endorsement would pay any judgment or settlement that resulted, up to the limit of the fire department's policy."

c.   "A fire department responds to a fire at a local chemical plant. Smoke from the plant settles on the truck, ladders and other equipment. Upon returning to the station, the equipment is hosed down. The runoff water flows down the street into a neighbor's privately owned pond, contaminating the pond and killing fish and exotic plants. The Operational Pollution Liability coverage would protect the fire department against legal action by the neighbor and would pay an award up to the limit of the policy."

159.   The foregoing examples, are substantially and materially similar to Plaintiff's claim against Defendant here.

**<u>FIRST CAUSE OF ACTION</u>**
**Mandatory Injunction Pursuant To 42 U.S.C. § 6972(a)(1)(B) (RCRA)**

160.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

161.   Pursuant to 42 U.S.C. § 6972(a)(1)(B)-

> [A]ny person may commence a civil action on his own behalf . . . against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).

162.   Pursuant to 42 U.S.C. § 6903(15), Plaintiff is a "person" as referenced in 42 U.S.C. § 6972(a)(1)(B).

163.     Pursuant to 42 U.S.C. §§ 6903(15) and 6972(a)(1)(B), Defendant is a "person" as referenced in 42 U.S.C. § 6972(a)(1)(B).

164.     Pursuant to 42 U.S.C. § 6903(5), PFOA and PFOS are solid wastes and/or hazardous wastes.

165.     Defendant has contributed and/or is contributing to the handling, storage, and/or disposal of solid waste and/or hazardous wastes at and emanating from the Superfund Site.

166.     Defendant's handling, storage, and/or disposal of AFFF containing PFOA/PFOS and/or their precursors within the boundaries of the Superfund Site may present an imminent and substantial endangerment to the health of the citizens of the Town and/or the environment.

167.     By reason of the foregoing Plaintiff is entitled to an injunction requiring Defendant to: (i) properly dispose of all AFFF that contains PFOA, PFOS and/or PFOA/PFOS precursors, (ii) immediately disclose by fact discovery document production and testimony all locations where EHFD used AFFF, stored AFFF and washed AFFF equipment at the Airport and/or within the boundaries of the Superfund Site, and (iii) investigate and remediate, or pay for the investigation and remediation of, all PFOA/PFOS contamination at and emanating from the Airport and/or Superfund Site caused, in whole or in part, by EHFD's storage of AFFF, use of AFFF and washing of AFFF equipment.

## SECOND CAUSE OF ACTION
### Response Costs Pursuant to 42 U.S.C. § 9607 (CERCLA)

168.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

169.     Defendant is a "person," as defined by Section 101(21) of CERCLA, 42 U.S.C. §§ 9601(21), as an individual, firm, corporation, association, partnership, consortium, joint

venture, commercial entity, United States Government, municipality, commission, political subdivision of a State, or any interstate body.

170.     Defendant is a potentially responsible party pursuant to section 107(a) of CERCLA as Defendant: (i) is the operator of the Airport, EHFD Substation and/or Fire Training Facility, (ii) was the operator of the Airport, EHFD Substation and/or Fire Training Facility at the time of disposal of PFOA/PFOS at those facilities, and/or (iii) arranged for disposal of PFOA/PFOS at the Airport, EHFD Substation and/or Fire Training Facility via EHFD's AFFF use, AFFF storage and washing of AFFF equipment that was owned or possessed by Defendant, through EHFD.

171.     By EHFD's AFFF use, AFFF storage and washing of AFFF equipment, Defendant has contributed to the contamination at and emanating from the Superfund Site.

172.     The Superfund Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

173.     Disposal of hazardous substances at the Superfund Site resulted in the release of hazardous substances to the environment (as the term "release" is defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22)).

174.     Defendant is thus liable under Section 107(a) of CERCLA, 42 U.S.C. § 6907(a).

175.     Consistent with the National Contingency Plan, Plaintiff has incurred, is incurring, and will continue to incur necessary response costs to address the release or threatened release of hazardous substances at and emanating from the Superfund Site, as required under CERCLA, 42 U.S.C. § 9607(a), and as set forth in the rules promulgated by the EPA, 40 CFR Sections 300 et seq.

176.     By reason of the foregoing, Plaintiff is entitled to judgment for all response costs and damages incurred to the date of judgment.

**THIRD CAUSE OF ACTION**
**Declaratory Judgment Pursuant To 42 U.S.C. § 9613(g)(2)  (CERCLA)**

177.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

178.     By reason of the foregoing, an actual, substantial and legal controversy now exists between Plaintiff and Defendant regarding Defendant's obligation to fund all future costs associated with addressing the contamination at and emanating from the Superfund Site as referenced herein (including, but not limited to, costs of compliance with NYSDEC, all subsequent remediation, and all applicable laws).

179.     A declaratory judgment will prevent the need for multiple lawsuits as Plaintiff continues to incur costs of response in connection with the Superfund Site for which Defendant should be liable, and will provide a final resolution of the issue between the parties regarding liability for such costs.

180.     A declaratory judgment will insure that Defendant pays its fair share of costs in connection with addressing the contamination at and emanating from the Superfund Site, insuring a proper response to the problem.

181.     A declaratory judgment will insure that Plaintiff's and Defendant's allocation of cost associated with addressing the contamination at and emanating from the Superfund Site is established, insuring a proper response to the problem.

182.     Public interest will be served in that a declaratory judgment will insure an environmentally proper response to the contamination existing at the Superfund Site.

183.     Plaintiff is entitled to a declaratory judgment under 42 U.S.C. §9613(g)(2).

184.     Plaintiff is thus entitled to a declaratory judgment that Defendant is legally responsible for the future response costs, and any other future costs incurred by Plaintiff' in connection with the Superfund Site.

**WHEREFORE,** Plaintiff Town of East Hampton requests judgment in its favor and against Defendant as follows:

i.     An injunction requiring Defendant to: (i) immediately disclose by fact discovery document production and testimony all locations where EHFD used AFFF, stored AFFF and washed AFFF equipment at the Airport and/or within the boundaries of the Superfund Site, as well as the contact information for all individuals with knowledge of such information, and (ii) investigate and remediate under NYSDEC oversight with participation of the Town, or pay for the investigation and remediation of, all PFOA/PFOS contamination at and emanating from the Superfund Site caused, in whole or in part, by EHFD's storage of AFFF, use of AFFF and washing of AFFF equipment;

ii.     Against Defendant, a money judgment in an amount to be determined at trial for all past and future costs incurred or to be incurred by Plaintiff responding to the PFOA/PFOS contamination at and emanating from the Superfund Site, including, but not limited to, (i) costs to supply bottled water to the Town's residents who have detected PFOA/PFOS compounds in their drinking water wells, (ii) costs to extend the public drinking water supply line and connecting the homes of Wainscott residents thereto to enable the supply of clean and safe drinking water, (iii) costs to investigate, treat and remediate contamination at and emanating from the Superfund Site, and (iv) costs to protect the public health, safety, welfare, and the environment;

iii.     A declaratory judgment declaring Defendant's allocation of costs and liability associated investigating and remediating the Superfund Site and NYSDEC compliance;

iv.     All other appropriate injunctive relief;

v.      All other appropriate declaratory relief;

vi.     Awarding punitive damages in a sum to be determined at trial;

vii.    Awarding pre- and post-judgment interest, with costs and disbursements

viii.   Awarding Plaintiff the costs of litigation, including legal fees, expert witness fees

and associated litigation costs, in an amount to be determined at trial, pursuant to and/or 42

U.S.C. § 6972(e); and

ix.     Awarding such other, further and different relief as the Court deems just and

proper.

Dated:  April 13, 2020
        Melville, New York

Respectfully submitted,

**RIGANO LLC**
*Attorneys for Town of East Hampton*

By: _s/ Nicholas C. Rigano_
    James P. Rigano, Esq.
    Nicholas C. Rigano, Esq.
    Alyse Delle Fave, Esq.
    538 Broad Hollow Road, Suite 217
    Melville, New York 11747
    (631) 756-5900